George Andrews, J.,
delivered the opinion of the Court.
This is an action brought by Shores against Robertson, upon promissory notes. Judgment was rendered in the Circuit Court in favor of the plaintiff, Shores.
There was some evidence upon the trial tending to show that the consideration for which the' notes were given, was Confederate money.
The Circuit Court Judge instructed the jury, that, if the transaction in which the notes were given, was in the ordinary and necessary business of life, and not for speculation, and that at the time of the transaction Confederate notes were the only general circulating paper or money; and that, either from compulsion or necessity, such notes were so used in ^transacting the com *166 mon and ordinary business of life; and if tbe parties esteemed or attached any value to the Confederate notes, then they should find a verdict for the plaintiff for the value so attached, with interest.
The effect which should be given to Confederate Treasury Notes, as the consideration of a contract, has been so often considered by this Court that it would seem superfluous to add more upon the subject, had not the recent case of Thorington vs. Smith, decided by the Supreme Court of the United States, held a doctrine differing from that heretofore announced by this Court.
It was held in that case, that a contract made in the State of Alabama, during the late rebellion, for the payment of Confederate Treasury Notes, was a valid contract, which might be enforced in the courts of the United States, and that the party entitled, by the terms of the contract, to receive Confederate dollars, could recover their actual value, at. the time and place of the contract, in lawful money of the United States.
That this currency was unlawfully created and issued by a treasonable organization, and for an unlawful and treasonable purpose, is undeniable, and is not denied in the decision just alluded to.
It created no valid contract between the organization issuing it and the parties receiving it; and whether considered as money, or as a promise by the quasi Rebel Government to pay money, was wholly illegal and void.
We do not base our decision upon the assumption that a currency issued in violation of law, or without authority of law, has thereby such a character of illegality impressed upon it that it would necessarily be a *167 violation of law to pass it or to deal in it. Cases might, perhaps, exist, in which securities illegally issued might be held to be valueless, and to be void as the consideration of a contract, and yet parties be guilty of no offense against the law or public policy in paying them or accepting them, if they thought it for their interest tb do so.
We do not say that, if the Rebel authorities, during the late rebellion, had coined and issued gold in aid of the rebellion, or had bartered cotton or other property for the same purpose, such gold or other property would thereby have had impressed upon it such illegal character that it could not subsequently be dealt in as merchandise. But, however that may be, any agreement for the delivery of such gold or other property, made for the purpose of aiding the rebellion, would have been illegal, without respect to the illegal origin of the property. And, as every man must be held to intend the necessary consequences of his own acts, if the delivery of or dealing in a particular currency must necessarily and directly tend to aid the rebellion, such dealing or delivery must be held to be illegal, without inquiry as to the actual purpose of the parties to the transaction.
The true question in this case is, therefore, whether the dealing in Confederate currency, and the treating of it as money in the ordinary transaction of business between citizens, necessarily and directly tended to aid the rebellion. If such was the tendency, such, acts were illegal, and all contracts for the performance of such acts void.
*168 The fact that the currency was issued under the authority claimed-by a government of paramount force, controlling the territory where the transaction in question took place, can not, in my opinion, make any difference.
Whatever might be the rights and obligations of citizens in a portion of our territory, in the temporary occupation of a recognized sovereign belligerent power, as was the case with the town of Castine during the last war with Great Britain, the occupation and control of territory by the Hebei forces and authorities, did not operate to make lawful voluntary acts of hostility against the United States, on the part of citizens of such territory.
Eebel coercion may relieve the act from its criminal character; but a voluntary act in aid of the rebellion was not lawful, though committed within territory under control and in occupation of the Eebel forces. The Eebel government was not a government de facto in such a sense that allegiance was due to it, or that voluntary acts in aid of it were lawful.
Were the passing and dealing in the Eebel currency acts so directly and materially in aid of the rebellion, that the courts are required to consider and treat them as unlawful, and as contrary to the policy of the law of the United States? This Court has heretofore held that they were.
This currency was the life-blood of the Confederacy, and the war could not have been carried on for any considerable length of time without the support furnished by it. The success of the rebellion depended, in great measure, upon the ability of the Eebel au *169 thorities to sustain the credit of their currency. Such credit as it had, enabled them to maintain the war while it was maintained; and the collapse of this currency was one important reason that the war ended when it did.
It is not necessary, in order to hold such acts unlawful, that we should say that they were, in themselves, acts of treason against the United States. It is sufficient if they were acts tending directly to the disadvantage of the rightful government, and which it is contrary to the policy of that government to support and uphold.
This currency consisted of promises, on the part of the Confederacy, to pay money in the future. It had no intrinsic value; and its value and availability as a currency depended wholly upon the chances of success of the usurping power which issued it. It was, by the terms of every note, payable only upon the expiration of six months after the ratification of a treaty of peace between the Confederate States and the United States. The intended and the actual effect of the issuance and circulation of this currency, was, to make every noteholder a stockholder in the Confederacy, and directly interested to the extent of his investment to secure the ultimate success of the Rebel cause. That this was regarded as a matter of practical importance to the Confederacy, and not a theory merely, is evidenced by the historic facts of the desperate efforts made by the Confederate leaders to uphold their currency, and the despotic orders promulgated by military commanders, and intended to compel its reception by the citizens, as money, upon pain of the severest punishment for refusal.
*170 It was for the interest of the United States to discredit these notes, and to discountenance their circulation, and they would have suppressed all dealings in them had they been able to do so; and every person who accepted them, paid them out, or dealt in them as currency, performed an act which was in aid of the Confederacy, and was opposed to the policy of the United States. The attempt to circulate Confederate notes in the loyal States during the rebellion, would certainly have been unlawful. The circulation of them in the rebel States during the same period, may have been more excusable, but was not the less unlawful.
The Supreme Court of the United States is a tribunal whose decisions command and receive our highest respect and consideration, even in cases like the present, where they do not absolutely conclude our action.
But the question now before us has been settled by numerous decisions of this Court, made at every term held since the termination of the war. We are satisfied with those decisions, and are unable to coincide with the line of reasoning adopted by the Supreme Court of the United States in Thorington vs. Smith, and do not feel that we would be justified in now overruling our own well settled adjudications.
In accordance with our previous decisions, we hold, that the instructions given to the jury in the present case were erroneous; and that the judgment must be reversed and a new trial awarded.